UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRIMED PHARMACEUTICALS LLC,

                        Plaintiff,

            -v-

                                                    CIVIL ACTION NO.: 21 Civ. 1025 (SLC)

STARR INDEMNITY & LIABILITY COMPANY,                **OPINION AND ORDER**

                        Defendant.

**SARAH L. CAVE**, United States Magistrate Judge.

## I.  INTRODUCTION

Plaintiff PriMed Pharmaceuticals LLC ("PriMed") brought this breach of contract and declaratory judgment action against Defendant Starr Indemnity & Liability Company ("Starr") seeking damages and a declaration that Starr has a duty to defend and indemnify PriMed in connection with a pending trademark litigation.  (ECF No. 1 ¶¶ 51–63 (the "Complaint")).  PriMed now moves pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment with respect to Starr's duty to defend.  (ECF No. 75 ("PriMed's Motion")).  Starr opposes PriMed's Motion and cross-moves for summary judgment dismissing the Complaint and declaring that Starr has no duty to defend or indemnify PriMed.  (ECF No. 90 ("Starr's Motion"), with PriMed's Motion, the "Motions")).

For the reasons set forth below, PriMed's Motion is GRANTED and Starr's Motion is DENIED.

## II. BACKGROUND

### A. Factual Background

The Court summarizes the facts as set forth in PriMed's Rule 56.1 Statement of Undisputed Material Facts (ECF No. 77 ("PriMed's 56.1")), Starr's Response to PriMed's 56.1 (ECF No. 100), Starr's Rule 56.1 Counterstatement of Undisputed Material Facts (ECF Nos. 91 ("Starr's 56.1"); 101), and PriMed's Response to Starr's 56.1 (ECF No. 103), and their accompanying declarations and exhibits.  The facts are undisputed unless otherwise noted.

### 1. The Parties

PriMed is a New Jersey limited liability corporation engaged in the whole distribution of medical products.  (ECF Nos. 77 ¶ 1; 91 ¶¶ 1–2, 3; 100 ¶ 1; 103 ¶¶ 1–3).[1]  PriMed also maintains its headquarters in New Jersey.  (ECF Nos. 91 ¶ 2; 103 ¶ 2).[2]  PriMed "is licensed in 39 states and provides pharmaceutical products to about 2,000 independent pharmacies[.]"  Matrix Distribs., Inc. v. Nat'l Ass'n of Bds. of Pharmacy, 34 F.4th 190, 194 (3d Cir. 2022).[3]  Starr is a New York corporation.  (ECF Nos. 77 ¶ 2; 100 ¶ 2).

### 2. The Policy

In 2014, PriMed purchased from Starr a commercial general liability ("CGL") insurance policy (the "Policy") covering the annual policy period from November 15, 2014 until November 15, 2015 (the "Policy Period").  (ECF Nos. 77 ¶¶ 3, 10; 91 ¶ 11; 100 ¶ 3, 10; 103 ¶ 11;

---

[1] Unless otherwise noted, the Court does not cite the exhibits cited within PriMed's 56.1 and Starr's 56.1.

[2] The parties dispute whether PriMed's headquarters are in Neptune, New Jersey, or Eatontown, New Jersey, but the difference is not material to the Motions.  (Compare ECF No. 91 ¶ 2 with ECF No. 103 ¶ 2).

[3] Unless otherwise indicated, internal citations and quotation marks are omitted from case citations.

see ECF No. 96-7).[4]  Before November 15, 2014, PriMed did not have a CGL policy that covered

advertising injury.  (ECF Nos. 103 ¶ 12; 108 at 21).  The Policy was renewed for the 2015–2016

policy period.  (ECF Nos. 77 ¶ 4; 100 ¶ 4).  The relevant provisions of the Policy are set forth

below.

### a.  Coverage

The Policy provides insurance coverage to PriMed for, inter alia, "Business Liability", as

follows:

> a. We will pay those sums that the insured becomes legally obligated to pay as
> damages because of "bodily injury", "property damages" or "personal and
> advertising injury" to which this insurance applies.  We will have the right and duty
> to defend the insured against any "suit" seeking those damages.  However, we will
> have no duty to defend the insured against any "suit" seeking damages for "bodily
> injury", "property damage" or "personal and advertising injury" to which this
> insurance does not apply.  We may, at our discretion, investigate any "occurrence"
> or any offense and settle any claim or "suit" that may result.

(ECF No. 96-7 at 66 § (II)(A)(1)(a); see ECF Nos. 91 ¶ 14; 103 ¶ 14).

### b.  Definitions

Under the Policy, a "[p]ersonal and advertising injury" is "injury, including consequential

'bodily injury', arising out of", inter alia, "[i]nfringing upon another's copyright, trade dress or

slogan in your 'advertisement'."  (ECF No. 96-7 at 80 § (II)(F)(14)(g); see ECF Nos. 77 ¶ 6; 100 ¶ 6).

The Policy defines an "Advertisement" as "a notice that is broadcast or published to the general

public or specific market segments about your goods, products or services for the purpose of

attracting customers or supporters[,]" and specifies that "[n]otices that are published include

---

[4] Both parties have submitted copies of the Policy, but Starr's version includes various riders and
endorsements, and therefore, appears more complete.  (Compare ECF No. 78-1 with ECF No. 96-7; see
ECF No. 108 at 32).  Accordingly, the Court cites only to the copy of the Policy Starr has submitted,
ECF No. 96-7.

material placed on the Internet or on similar electronic means of communication[.]"  (ECF No. 96-7 at 78 § (II)(F)(1)(a); <u>see</u> ECF Nos. 77 ¶ 7; 91 ¶ 15; 100 ¶ 7; 103 ¶ 15).

### c.  <u>Exclusions</u>

The Policy excludes from coverage PriMed's liability for "[p]ersonal and advertising injury" that was:

> (1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";
> (2) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;
> (3) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period [the "Prior Publication Exclusion"];
> . . .
> (12) Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.  Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".
> . . .

(ECF No. 96-7 at 72–73 §§ (II)(B)(1)(p)(1)–(3), (12); <u>see</u> ECF Nos. 77 ¶ 9; 91 ¶ 18; 100 ¶ 9; 103 ¶ 18).  The Policy also excludes coverage for "'[p]ersonal and advertising injury' arising out of a criminal act committed by or at the direction of the insured."  (ECF No. 96-7 at 74 § (II)(B)(1)(r); <u>see</u> ECF Nos. 91 ¶ 20; 103 ¶ 20).

### 3.  <u>The Abbott Litigation</u>

On October 9, 2015, Abbott Laboratories and related entities ("Abbott") filed a lawsuit in the United States District Court for the Eastern District of New York.  <u>See</u> <u>Abbott Laboratories et al. v. Adelphia Supply USA et al.</u>, No. 15 Civ. 5826 (CMA) (LB) (E.D.N.Y.) (the "<u>Abbott Litigation</u>").

4

(ECF Nos. 1 ¶ 2; 77 ¶ 11; 100 ¶ 11).[5]  Abbott manufactures and sells blood glucose test strips under the tradenames, "FreeStyle" and "FreeStyle Lite," which diabetes patients use to monitor blood sugar levels.  (ECF Nos. 91 ¶ 7; 103 ¶ 7).  "Due to the differences between U.S. and international insurance, reimbursement, and rebate practices, Abbott sells FreeStyle test strips outside the United States at markedly lower list prices."  (Abbott Litigation ECF No. 1 ¶ 7; see ECF Nos. 91 ¶ 8; 103 ¶ 8).  In its original complaint, which did not name PriMed as a defendant, Abbott alleged that the defendants' "unauthorized importation and subsequent distribution [of Abbott international test strips] causes, or is likely to cause, consumer confusion, mistake, and deception to the detriment of Abbott, as well as to the detriment of consumers, insurance companies, third-party payors, and Medicaid and Medicare."  (Abbott Litigation ECF No. 1 ¶ 15).

On November 20, 2015, Abbott filed a first amended complaint, adding PriMed and other entities as defendants to the Abbott Litigation.  (ECF Nos. 77 ¶ 12; 96-3 (the "Abbott FAC"); 100 ¶ 12; see Abbott Litigation ECF No. 156).  In the Abbott FAC, Abbott alleged that, "[i]n the past 24 months"—i.e., after November 20, 2013, approximately one year before the Policy's Effective Date—PriMed had "purchased diverted international boxes of FreeStyle test strips . . . and sold them to numerous pharmacies[.]"  (ECF No. 96-3 ¶ 223; Abbott Litigation ECF No. 156 ¶ 223; see ECF No. 108 at 20 ("November 20 of 2013 is when the alleged wrongful conduct first started.  That's approximately a year before the inception date of the Starr policy.")).

On March 28, 2016, Abbott filed a second amended complaint (the "Abbott SAC"), which became the operative pleading in the Abbott Litigation.  (ECF Nos. 77 ¶ 13; 78-2; 96-4; 100 ¶ 13;

---

[5] In PriMed's 56.1, PriMed lists the docket number of the Abbott Litigation as 15 Civ. 4530 (CMA) (LB).  (ECF No. 77 ¶ 11).

see Abbott Litigation ECF No. 307).  The Abbott SAC alleges that the defendants in the Abbott Litigation, including PriMed (the "Abbott Defendants"), engaged in the "unauthorized importation, advertisement, and subsequent distribution" of "diverted international FreeStyle test strips," causing "consumer confusion, mistake, and deception to the detriment of Abbott, as well as to the detriment of consumers, insurance companies, third-party payors, and Medicaid and Medicare."  (ECF Nos. 78-2 ¶ 15; 96-4 ¶ 15; see Abbott Litigation ECF No. 307 ¶ 15).  Abbott alleges that by "[u]sing Abbott's trademarks and trade dress, [the Abbott] Defendants advertise to consumers and the marketplace their ability and willingness to sell FreeStyle test strips.  These advertisements are made through, inter alia, websites, emails, facsimiles, point-of-sale displays, and other media."  (ECF Nos. 78-2 ¶ 385; 96-4 ¶ 385 (emphasis added); see Abbott Litigation ECF No. 307 ¶ 385).[6]  Abbott again alleged that "[i]n the past 24 months [i.e., after March 28, 2014], PriMed has purchased diverted international boxes of FreeStyle test strips from" another Abbott Defendant "and sold them to numerous pharmacies[.]"  (ECF Nos. 78-2 ¶ 431; 96-4 ¶ 431; see Abbott Litigation ECF No. 307 ¶ 431).

### 4.  PriMed's Pre-Policy Activity

On or about September 10, 2013, PriMed began selling Abbott International FreeStyle test strips before the Policy Period.  (ECF Nos. 91 ¶¶ 31–32; 93 at 20; 103 ¶¶ 31–32).  "In every instance in which PriMed purchased and sold Abbott International Freestyle test strips, the test strips were contained in a package of either 50 or 100 test strips."  (ECF Nos. 91 ¶ 43; 103 ¶ 43; see ECF No. 78-10 ¶ 37).

---

[6] The distribution to U.S. consumers of "FreeStyle diabetes test strips designed for sale internationally" is referred to as a "gray market."  Abbott Labs. v. Adelphia Supply USA, No. 15 Civ. 5826 (CBA) (LB), 2015 WL 10906060, at *1 (E.D.N.Y. Nov. 6, 2015), aff'd, 670 F. App'x 6 (2d Cir. 2016).

In this action, Starr conducted "<u>narrow</u> discovery into extrinsic evidence concerning '<u>advertising</u>' and '<u>advertising activities</u>' by PriMed before November 15, 2014." (ECF No. 37 (the "Aug. 23 Order")).  Matthew Zeigler, PriMed's President and Owner ("Zeigler"), submitted a declaration attesting that "PriMed did not advertise Abbott International FreeStyle test strips prior to November 15, 2014[,]" and that "PriMed ha[d] no documents showing that it advertised Abbott International FreeStyle test strips prior to November 15, 2014, because there [we]re none." (ECF No. 78-10 ¶¶ 17–18; <u>see</u> <u>id.</u> ¶ 20 ("[T]here has never been a single advertisement by PriMed in existence of Abbott International FreeStyle test strips prior to November 15, 2014.")).  Zeigler also attested that PriMed's website was created and implemented in approximately January 2014, but that "Abbott International FreeStyle test strips were not displayed or advertised on the Pri[M]ed website prior to November 15, 2014." (<u>Id.</u> ¶¶ 41–42). Zeigler created a LinkedIn account in June 2014, but "Abbott International FreeStyle test strips were never displayed or advertised on [his] LinkedIn page prior to November 15, 2014." (<u>Id.</u> ¶¶ 44–45).

PriMed produced to Starr the same documents that PriMed had produced in the <u>Abbott</u> Litigation (the "<u>Abbott</u> Production").  (ECF Nos. 77 ¶ 29; 100 ¶ 29).  The <u>Abbott</u> Production included emails, none of which "depict[ed] the Abbott International FreeStyle test strip box[.]" (ECF Nos. 77 ¶ 31; 100 ¶ 31; 108 at 10).  Included in the <u>Abbott</u> Production were, however, two emails on which the parties focus in the Motions:

    (i) a July 23, 2014 email from PriMed to 15 customers with the subject line, "PriMed Offer 7.23.14" and stating, "FIRST COME FIRST SERVED ALL IN STOCK[,]" followed by a list of products for sale and their respective prices, including Abbott's "Freestyle Lite[.]"  (ECF No. 94 (the "July 23 Email")); and

> (ii) an August 18, 2014 email from PriMed to 12 customers with the subject line, "PriMed Offer 8.18.2014" and stating "ALL PRODUCT IN STOCK AND 1yr+ dating unless specified[,]" followed by a list of products for sale and their respective prices, including 84 Abbott test strips.

(ECF No. 95 (the "Aug. 18 Email," with the July 23 Email, the "Emails")).  PriMed sent the July 23 Email to 15 customers, and the August 18 Email to twelve (12) customers.  (ECF Nos. 94; 95). The parties dispute whether the Emails constituted "advertising" under the Policy. (See ECF Nos. 100 ¶¶ 33–35; 103 ¶ 40).

Zeigler was deposed on June 7, 2017 in the Abbott Litigation, and on February 3, 2022 in this action.  (ECF Nos. 92; 93).  Zeigler testified that PriMed sent emails to its wholesale "customers with offers to sell FreeStyle test strips[,] including the international FreeStyle test strips[.]"  (ECF No. 92 at 297–98; see id. at 46–51).  Zeigler also testified that, during the period from September 10, 2013 until November 15, 2014, PriMed sent to its customers "order forms" (the "Order Forms"), which "offer[ed] product in [its] inventory . . . with a description of the product and the price [with] a space or designated space for a quantity that a customer would want to order."  (ECF No. 93 at 37; see ECF Nos. 91 ¶ 42 ("This order form . . . included a description of the Free Style Lite Test Strip as well as the price for that product with a space for the customer to indicate the desired quantity."); 92 at 298 (PriMed faxed to customers "a printed sheet with pricing on it"); 103 ¶ 42).

### 5.  PriMed's Claim Under the Policy and Starr's Denial of Coverage

On March 29, 2016, PriMed's counsel notified Starr by email of the Abbott SAC and asked Starr to confirm that it would "honor its duty to defend Pri[M]ed."  (ECF No. 96-5; see also ECF No. 78-4).  On May 23, 2016, Starr notified PriMed of its decision to disclaim coverage and deny liability under the Policy because, inter alia:

> Abbott expressly alleges that Pri[M]ed purchased diverted international FreeStyle test strips and sold them to numerous pharmacies during the 24-month period before the filing of the [Abbott FAC] – as early as November 20, 2013, which is approximately a year prior to the inception of the [Policy]. As such, coverage is disclaimed because the "advertisements" complained of were first published prior to the inception of [the Policy]."

(ECF Nos. 78-5 at 7; 96-6 at 6).

**B.   Procedural Background**

On February 4, 2021, PriMed commenced this action, asserting that Starr breached the Policy by refusing "to cover, defend, and compensate PriMed in the Abbott Litigation[,]" and seeking a declaratory judgment that Starr had "a duty to defend and indemnify PriMed in the Abbott Litigation."   (ECF No. 1 ¶¶ 57–59, 61–63).   On April 26, 2021, Starr filed an answer. (ECF No. 16).

PriMed moved to preclude Starr from seeking discovery of extrinsic evidence concerning PriMed's pre-Policy Period advertising activities, which Starr had sought in support of its invocation of the Prior Publication Exclusion.   (ECF No. 32 (the "Motion to Preclude")).   Starr opposed the Motion to Preclude (ECF No. 35), and, following a conference with the parties, the Court issued the Aug. 23 Order, granting in part and denying in part the Motion to Preclude and permitting Starr to take "narrow discovery into extrinsic evidence concerning 'advertising' and 'advertising activities' by Pri[M]ed before November 15, 2014."   (ECF No. 37; see ECF min. entry Aug. 23, 2021; ECF No. 38).   The parties disputed PriMed's compliance with the Aug. 23 Order, which the Court addressed in several follow-up conferences.   (ECF min. entries Sept. 9, 2021; Oct. 13, 2021; Jan. 14, 2022; see ECF Nos. 43; 48).

After an unsuccessful settlement conference (see ECF min. entry May 25, 2022), the parties consented to Magistrate Judge jurisdiction (ECF Nos. 68; 69), and filed the Motions

pursuant to the Court-ordered schedule.  (ECF Nos. 71–75; 90).[7]  On January 5, 2023, the Court

heard oral argument on the Motions.  (ECF Nos. 106–08; <u>see</u> ECF min. entry Jan. 5, 2023).

### III.  DISCUSSION

**A.  Legal Standard for Motions for Summary Judgment**

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In ruling on a summary

judgment motion, the district court must resolve all ambiguities, and credit all factual inferences

that could rationally be drawn, in favor of the party opposing summary judgment and determine

whether there is a genuine dispute as to a material fact, raising an issue for trial."

<u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007).  "Only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

"Material facts are those which 'might affect the outcome of the suit under the governing

law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.'"  <u>Coppola v. Bear Stearns & Co.</u>, 499 F.3d 144, 148 (2d Cir. 2007)

(quoting <u>Anderson</u>, 477 U.S. at 248).  "[I]n ruling on a motion for summary judgment, a judge

must ask [her]self not whether [s]he thinks the evidence unmistakably favors one side or the

other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence

---

[7] The Clerk of the Court rejected Starr's initial filing of its Motion (ECF Nos. 86–88), and Starr correctly filed its Motion at ECF No. 90.

presented[.]"  Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 788 (2d Cir. 2007) (quoting

Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 298 (2d Cir. 1996)).

### B. Application

PriMed's Motion seeks partial summary judgment determining that Starr breached its

duty to defend PriMed in the Abbott Litigation.  (ECF No. 76 at 7; see ECF No. 102 at 6 ("PriMed's

motion is limited to liability")).  Starr's Motion seeks a declaration that PriMed "is not entitled to

a defense or indemnification in connection with the" Abbott Litigation.  (ECF No. 90 at 6).

Resolution of the Motions turns on the question whether a genuine issue of material fact exists

as to the application of the Prior Publication Exclusion.  (See ECF No. 76 at 19–29; 90 at 14–27).

The parties first disagree on which state's law applies, so the Court first conducts a choice of law

analysis before evaluating whether the Prior Publication Exclusion applies.

### 1. Choice of Law

The Policy does not contain a choice of law clause.  (ECF No. 108 at 5–6).  PriMed argues

that there is no difference in the applicable law between New York and New Jersey, and

therefore, the forum law of New York applies.  (ECF Nos. 76 at 16; 102 at 9; 108 at 4–5).  Starr

argues that New Jersey law applies because, as the state of PriMed's incorporation and principal

office, New Jersey is the state that "'the parties understood was to be the principal location of

the insured risk . . . .'"  (ECF No. 90 at 13–14 (quoting Certain Underwriters at Lloyd's, London v.

Foster Wheeler Corp., 36 A.D.3d 17, 21–22 (1st Dep't 2006), aff'd, 9 N.Y.3d 928 (2007)).  In the

Aug. 23 Order, the Court cited both New York and New Jersey law, and therefore, contrary to

Starr's contention (id. at 13), has not previously determined which state's law applies to the

merits of the parties' dispute.  (ECF No. 37 at 1 (citing Value Wholesale, Inc. v. KB Ins. Co.,

450 F. Supp. 3d 292 (E.D.N.Y. 2020) and Polarome Int'l, Inc. v. Greenwich Ins. Co., 404 N.J. Super. 241 (N.J. App. Div. 2008)).

Because the Court's federal subject matter jurisdiction derives from the parties' diverse citizenship, (ECF No. 1 ¶ 10), "this Court must apply the choice of law rules of the forum state, New York." Emps. Ins. of Wausau v. Duplan Corp., 899 F. Supp. 1112, 1116 (S.D.N.Y. 1995) (citing Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)); see Homestead Vill. Assoc., L.P. v. Diamond State Ins. Co., 818 F. Supp. 2d 642, 646 (E.D.N.Y. 2011) ("Federal Courts sitting in diversity apply the choice-of-law analysis of the forum state."). "Under New York choice-of-law rules, courts first determine whether there is a substantive conflict between the laws of the relevant choices." Feldman L. Grp. P.C. v. Liberty Mut. Ins. Co., 819 F. Supp. 2d 247, 255 (S.D.N.Y. 2011), aff'd, 476 F. App'x 913 (2d Cir. 2012). "In the absence of [a] substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004).

In a breach of contract case such as this, if a conflict between states' law exists, "the governing law is the law of the state which has the most significant contacts with the dispute." Emps. Ins., 899 F. Supp. at 1116. For insurance coverage disputes, "New York generally gives controlling effect to the law of the jurisdiction which has the greatest interest in the matter. Important factors in making[ ]this determination are, for example, location of the insured risk, residence of the parties, and where the contract was issued and negotiated." Munzer v. St. Paul Fire & Marine Ins. Co., 145 A.D.2d 193, 200–01 2d Dep't 1989); see Avondale Indus., Inc. v. Travelers Indem. Co., 774 F. Supp. 1416, 1422–23 (S.D.N.Y. 1991) (under New York choice of law

analysis, applying law of state where policies were executed, issued, and brokered and where insureds maintained principal place of business).  Where the policy covers risks in multiple states, "the goals of certainty, predictability and uniformity of result and ease in the determination and application of the law to be applied augur in favor of applying the laws of the insured's principal domicile."  Feldman Law Grp., 819 F. Supp. 2d at 256.

The Court finds that, because Starr has failed to show a substantive, material difference between the applicable laws of New York and New Jersey, and New York law "is among the relevant choices," New York law applies to the resolution of the Motions.  Int'l Bus. Mach., 363 F.3d at 143; see Park Place Enter. Corp. v. Transcont'l Ins. Co., No. 01 Civ. 6546 (ELC), 2003 WL 1913709, at *3 (S.D.N.Y. Apr. 18, 2003) (applying New York law, which was "similar in all material respects" to alternative state's law, such that "no actual conflict of law" existed).  Pressed at oral argument for a substantive difference between New York and New Jersey law, Starr acknowledged that "[b]oth jurisdictions do permit the Court to look to extrinsic facts to determine whether PriMed is not entitled to a defense under the [P]rior [P]ublication [E]xclusion[,]" with the "only" possible distinction being that New Jersey is "arguably . . . more liberal" in "[p]ermitting review of extrinsic facts[]" to determine whether a duty to defend exists. (ECF No. 108 at 27).  Starr does not cite any case that compared New York and New Jersey law regarding advertising injury or extrinsic evidence and found any substantive distinction, however, nor did PriMed's nor the Court's research uncover any.  (Id. at 5).  In the absence of a substantive conflict, then, the Court may reasonably apply New York law without resort to a full choice-of-law analysis.  See Emps. Ins., 899 F. Supp. at 1118 (where there was no conflict between New York and Virgin Islands law on applicability of exclusion, applying New York law without

undertaking choice-of-law analysis); cf. GlobalNet Financial.com, Inc. v. Frank Crytstal & Co., 449 F.3d 377, 382–83 (2d Cir. 2006) (where there was "an actual conflict between the laws of New York and Florida[,]" undertaking choice-of-law analysis); Feldman Law Grp., 819 F. Supp. 2d at 256–57 (where Pennsylvania and New York law differed on when the duty to defend arose, and the "difference ha[d] the potential to fundamentally alter a court's analysis, [it was] a conflict sufficient to require a formal choice-of-law analysis").  Therefore, the Court will apply New York law to determine whether Starr has a duty to defend PriMed in the Abbott Litigation.

### 2.  Duty to Defend

#### a.  New York Law Principles

An insurer's duty to defend is a contractual obligation.  See Am. Home Prods. Corp. v. Liberty Mut. Ins. Co., 565 F. Supp. 1485, 1492 (S.D.N.Y. 1983), aff'd as mod., 748 F.2d 760 (2d Cir. 1984).  A court looks to "the language of the insurance policy to determine the nature and scope of an insurer's duty[, and] [i]f the policy's language is clear, the Court must enforce its plain meaning."  670 Apts. Corp. v. Agr. Ins. Co., No. 96 Civ. 1464 (PKL), 1996 U.S. Dist. LEXIS 14435, at *5 (S.D.N.Y. Oct. 2, 1996) (collecting cases).  The Court may appropriately consult a dictionary to determine the "ordinary meaning" of a term not defined in an insurance policy.  See Travelers Indem. Co. v. Northrop Grumman Corp., No. 16 Civ. 8778 (LGS), 2022 WL 4448502, at *6 (S.D.N.Y. Sept. 23, 2022).  "It is the well-settled law of [New York] that if an insurance policy or a clause thereof is reasonably susceptible of two different constructions, the one most favorable to the insured must be adopted."  Goldner v. Otsego Mut. Fire Ins. Co., 39 A.D.2d 440, 442 (3d Dep't 1972).  "Since the insurer is the author of the policy, its provisions must be strictly construed against the insurer and all ambiguities in terminology must be resolved in the insured's

favor so long as such a construction would be neither strained nor unnatural." Id.; see Jerry Madison Enters., Inc. v. Grasant Mfg. Co., No. 89 Civ. 2346 (MBM), 1990 WL 13290, at *5 (S.D.N.Y. Feb. 14, 1990) (noting that "insurance policies are liberally construed in favor of the insured, and against the insurance company that drafted the policy[]").

"Under New York law, an insurer's contractual duty to defend is broader than its duty to indemnify." Emps. Ins., 899 F. Supp. at 1119 (citing Curtis v. Nutmeg Ins. Co., 204 A.D.2d 833 (2d Dep't 1994)). The insurer's duty exists unless it establishes, "as a matter of law, that there is no possible factual or legal basis on which the insurer might eventually be obligated to indemnify [the insured] . . . under any provision contained in the policy." Villa Charlotte Bronte, Inc. v. Com. Union Ins. Co., 64 N.Y.2d 846, 848 (1985); accord Frontier Ins. Co. v. State, 87 N.Y.2d 864, 867 (1995); see Erdman v. Eagle Ins. Co., 239 A.D.2d 847, 849 (3d Dep't 1997) (explaining that, "when the uncontroverted facts prove that no duty to indemnify exists the insurer must be relieved of its duty to defend[]").

To determine whether the duty to defend has been triggered, courts applying New York law employ the "four corners of the complaint" test, which involves comparing the language of the policy with the allegations of the underlying complaint. See Fitzpatrick v. Amer. Honda Motor Co., 78 N.Y.2d 61, 65 (1991). The insurer's duty to defend arises "whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim, or where the insurer has actual knowledge of facts establishing a reasonable possibility of coverage." Feldman Law Grp., 819 F. Supp. 2d at 256. In addition, an insurer also "has a duty to defend in the opposite circumstance, i.e., where the pleadings do not allege a covered occurrence but the insurer has actual knowledge of facts demonstrating that the lawsuit does involve such an

occurrence." <u>Fitzpatrick</u>, 78 N.Y.2d at 63 (adding that "the insurer cannot use a third party's pleadings as a shield to avoid its contractual duty to defend its insured[]"); <u>see</u> <u>Feldman Law Grp.</u>, 819 F. Supp. 2d at 257 (observing that "New York will impose a duty to defend based on knowledge extrinsic to the contract[]").

The insurer's duty exists "no matter how false or groundless" the alleged facts may be that "give rise to any potential liability covered by the terms of the policy provided by the insurer." <u>Emps. Ins.</u>, 899 F. Supp. at 1119 (citing <u>Technicon Elecs. v. Am. Home Assur. Co.</u>, 74 N.Y.2d 66, 73 (1989)). "[I]f there is a doubt as to whether the claim comes within the insurer's duty to indemnify, the insurer is generally required to furnish a defense, leaving the issue of indemnification to be settled after establishment of the insured's liability." <u>Vill. of Sylvan Beach, N.Y. v. Travelers Indem. Co.</u>, 55 F.3d 114, 115 (2d Cir. 1995). "[W]hen a complaint pleads in the alternative, as long as one of the causes of action could potentially fall within the terms of the policy, the insurer must defend against the entire action." <u>670 Apts.</u>, 1996 U.S. Dist. LEXIS 14435, at *8 (citing <u>Ruder & Finn Inc. v. Seaboard Sur. Co.</u>, 52 N.Y.2d 663, 669–70 (1981)).

An insurer invoking an exclusion to avoid the duty to defend must demonstrate that the "allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations, <u>in toto</u>, are subject to no other interpretation." <u>Int'l Paper Co. v. Cont'l Cas. Co.</u>, 35 N.Y.2d 322, 325 (1974). "[E]xclusions are subject to strict construction and must be read narrowly." <u>Auto. Ins. Co. of Hartford v. Cook</u>, 7 N.Y.3d 131, 137 (2006). If the "insurer establishes that a policy exclusion applies, the burden shifts to the policyholder to prove that an exception to that exclusion applies." <u>Ment Bros. Iron Wks. Co. v. Interstate Fire & Cas. Co.</u>, 702 F.3d 118, 122 (2d Cir. 2012).

### b.  The Prior Publication Exclusion

The Court concludes that the existence of a genuine issue of material fact concerning whether PriMed published an "[a]dvertisement" before the Policy Period does <u>not</u> conclusively eliminate the potential for coverage under the Policy.  See <u>Vill. of Sylvan Bch.</u>, 55 F.3d at 115. Accordingly, Starr has a duty to defend PriMed in the <u>Abbott</u> Litigation.

### i.  The Abbott Litigation Alleges "Advertising Injury."

The first question the Court must answer is whether the <u>Abbott</u> Litigation "seeks damages for a covered injury."  <u>670 Apts.</u>, 1996 U.S. Dist. LEXIS 14435, at *8.  The Policy requires Starr to defend any suit against PriMed seeking damages for an "advertising injury," <u>i.e.</u>, where PriMed is alleged to have "[i]nfring[ed] upon another's copyright, trade dress or slogan in [its] 'advertisement'."  (ECF No. 96-7 at 80 § (II)(F)(14)(g); <u>see</u> ECF Nos. 77 ¶ 6; 100 ¶ 6).  The <u>Abbott</u> FAC's allegations concerning PriMed specifically are somewhat sparse, contending only that "[i]n the past 24 months, [PriMed] has purchased diverted international boxes of FreeStyle test strips . . . and sold them to numerous pharmacies[.]"  (ECF No. 96-3 at 67 ¶ 223).  The <u>Abbott</u> SAC is more detailed, however, alleging that PriMed engaged in "unauthorized importation, advertisement, and subsequent distribution" causing confusion about Abbott's brand and "valuable trademarks."  (ECF No. 96-4 at 10–11 ¶ 15; <u>see id.</u> at 81 ¶ 385 ("Using Abbott's trademarks and trade dress, Defendants advertise to consumers and the marketplace their ability and willingness to sell FreeStyle test strips.")).

Starr has conceded that, in the <u>Abbott</u> Litigation, "there are allegations of trade dress infringement, so the [P]olicy is arguably triggered."  (ECF No. 108 at 19).  Nor could Starr credibly assert otherwise, given the Honorable Kiyo A. Matsumoto's holding in <u>Value Wholesale</u>, that the

allegation in the <u>Abbott</u> SAC that the Abbott Defendants "'advertised' allegedly infringing goods [was] 'within the embrace of [a] policy'" that employed the same definition of "advertising injury" as the Policy here. 450 F. Supp. 3d at 303–04 (analyzing under New York law an insurer's duty to defend another Abbott Defendant).

Accordingly, the Court finds that, the allegations in the <u>Abbott</u> SAC have triggered Starr's duty to defend PriMed against claims of "advertising injury" in the <u>Abbott</u> Litigation.  <u>See</u> <u>CGS Indus., Inc. v. Charter Oak Fire Ins. Co.</u>, 720 F.3d 71, 82 (2d Cir. 2013) (holding that insurer had duty to defend advertising injury claim where underlying action alleged "wrongful acts, including advertising"); <u>Century 21, Inc. v. Diamond State Ins. Co.</u>, 442 F.3d 79, 83 (2d Cir. 2006) (holding that insurer had duty to defend insured "unless and until there [was] a point" at which, "with certainty," alleged injury "exclude[d] any issue relating to [insured's] conduct in the course of advertising[]"); <u>Bridge Metal Indus., L.L.C. v. Travelers Indemn. Co.</u>, 812 F. Supp. 2d 527, 537–38 (S.D.N.Y. 2011) (collecting cases and holding that insurer's duty to defend for advertising injury liability was triggered by potential claims of trade dress infringement).

### ii.    Whether PriMed Published an "Advertisement" <u>Before the Policy Period.</u>

Notwithstanding its concession as to "advertising injury," Starr invokes the Prior Publication Exclusion as eliminating any duty to defend PriMed in the <u>Abbott</u> Litigation. (ECF Nos. 108 at 20–21).  Starr acknowledges that it bears the burden to show that this exclusion applies, but contends that, because Abbott alleged in the <u>Abbott</u> FAC that PriMed's alleged wrongful conduct causing an advertising injury took place "[i]n the past 24 months"—since November 20, 2013—that conduct "occurred prior to the inception date of the [] [P]olicy,"—November 15, 2014—and therefore, the Prior Publication Exclusion applies.  (ECF No. 108 at 19–

20).  As examples of the allegedly infringing "advertisements," Starr asserts that the Emails, as well as Zeigler's testimony concerning the Order Forms, establish that PriMed "advertised the [test strips] through email offers, facsimiles, and other media[]" starting in September 2013.  (ECF No. 108 at 22–23 (citing ECF No. 96-4 at 81 ¶ 385)).  PriMed responds that the Prior Publication Exclusion does not apply because: (i) the <u>Abbott</u> SAC fails to identify the date of first publication of any allegedly infringing advertisement; (ii) PriMed did not publish "advertisements" within the meaning of the Policy; and (iii) even if the Emails were advertisements, they did not infringe on Abbott's trade dress rights.  (ECF Nos. 76 at 21–27; 108 at 9–14).

Applying the New York law principle that "exclusions are subject to strict construction and must be read narrowly," the Court finds that, in two respects, Starr has failed to carry its "heavy burden of demonstrating" that the allegations of the <u>Abbott</u> FAC "cast the pleadings wholly within the [Prior Policy Exclusion], that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which [Starr] may eventually be held obligated to indemnify [PriMed] under the exclusion."  <u>Auto. Ins. Co. of Hartford</u>, 7 N.Y.3d at 137.

First, the <u>Abbott</u> FAC—which Starr concedes is the pleading the Court must consider in determining whether the Prior Publication Exclusion applies because it is the first in which PriMed is named as a defendant (ECF No. 108 at 20)—does <u>not</u> definitively establish that PriMed published any advertisement <u>before</u> November 20, 2014.  The <u>Abbott</u> FAC alleged that PriMed "purchased" and "sold" FreeStyle test strips "[i]n the past 24 months[.]"  (ECF No. 96-3 at 67 ¶ 223).  The <u>Abbott</u> FAC was filed on November 20, 2015, so the preceding 24 months includes approximately one year covered by the Policy, and one year before the Policy Period that was

not covered.  (ECF No. 96-3 at 87; see ECF Nos. 77 ¶¶ 3, 10; 91 ¶ 11; 96-7; 100 ¶ 3, 10; 103 ¶ 11).

If PriMed "published" its first "advertisement" for Abbott's test strips in, for example, December

2014, the Prior Publication Exclusion would not apply; on the other hand, if PriMed "published"

its first "advertisement" in October 2014, the Prior Publication Exclusion would apply.  Because

this uncertainty in the Abbott FAC leaves open the possibility that the Prior Publication Exclusion

does not apply, Starr does have a duty to defend.  See SAS Grp., Inc. v. Great Am. E&S Ins. Co.,

No. 08 Civ. 1020 (LTS) (LMS), 2010 WL 11590320, at *8 (S.D.N.Y. Nov. 9, 2010) (holding that

insurer did "not carry its burden" to show that prior publication exclusion applied where

operative pleading did not provide dates on which insured published advertising); Int'l Paper Co.,

35 N.Y.2d at 325 (explaining that insurer seeking to invoke exclusion must "demonstrate that the

allegations of the complaint cast that pleading solely and entirely within the policy exclusions,

and, further, that the allegations, in toto, are subject to no other interpretation"); see also

Lexington Ins. Co. v. MGA Enter., Inc., 961 F. Supp. 2d 536, 558, 561–62 (S.D.N.Y. 2013) (holding

that prior publication exclusion did not apply where first publication date was not "undisputed").

In addition, the Abbott FAC does not mention any "advertising" activity by PriMed, only PriMed's

"purchase[]" and sale of FreeStyle test strips (ECF No. 96-3 at 67 ¶ 223), and thus arguably does

not allege the "causal connection" between Abbott's injury and PriMed's advertising activity

required for the Prior Publication Exclusion to apply.  See Bridge Metal, 812 F. Supp. 2d at 539–

40 (collecting cases holding "that the causal connection has been found lacking where the

complaint alleges injury solely from the manufacturing and selling of infringing goods"); Jerry

Madison, 1990 WL 13290, at *4 (finding no advertising injury where copyright infringement claim

was directed at insured's manufacture and sale, not marketing, of infringing jewelry).

Second, although the Emails <u>are</u> dated before the Policy Period, Starr has not established as a matter of law that they were published "advertisement[s]" within the definition in the Policy. To constitute an advertisement under the Policy, a "notice" must have been "broadcast or published to the general public or specific market segments[.]" (ECF No. 96-7 at 78 § (II)(F)(1)(a)). Starr does not contend that the Emails satisfy the "broadcast" element of this definition, so the Court considers only whether Starr has established as a matter of law that the recipients of the Emails represent "specific market segments" under the Policy. (<u>See generally</u> ECF No. 90). Here, PriMed sent the Emails to a dozen or so contacts (ECF Nos. 94; 95), a very small fraction—less than one percent—of its customer base of over 2,000 independent pharmacies. <u>See Matrix Distribs.</u>, 34 F.4th at 194. The Policy does not define "specific market segments[.]" (<u>See</u> ECF No. 96-7 at 78–81). Even assuming, however, that the recipients of the Emails comprised a "market segment" of PriMed's customers, Starr does not offer any undisputed evidence concerning the characteristics or commonalities of the recipients as would render them a "specific" category of PriMed's marketplace. <u>See</u> MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/specific (last visited Mar. 16, 2023) (defining specific as "constituting or falling into a specifiable category" or "sharing or being those properties of something that allow it to be referred to a particular category")). In addition, the Emails contain a list of products and prices (ECF Nos. 94; 95), and the Order Forms similarly list the products and prices next to a space for the customer to indicate the order quantity. (ECF Nos. 78-13 at 11; 91 ¶ 42; 92 at 298; 93 at 37). The "common meaning" of "advertising," however, contemplates an "inten[tion] to make something known to the public or to call public attention to something by emphasizing its <u>desirable qualities</u> so as to arouse a desire to buy." <u>Ben Berger & Son, Inc. v. Amer. Motorist Ins.</u>

Co., No. 94 Civ. 3250 (DC), 1995 WL 386560, at *3 n.3 (S.D.N.Y. June 29, 1995) (emphasis added). The Emails and Order Forms lack any such mention of the FreeStyle test strips' "desirable qualities[,]"and therefore, do not conclusively satisfy that "common meaning." See id. Starr otherwise provides no New York precedent establishing that the type of functional communications to existing customers that the Emails and the Order Forms represent meet the definition of "advertisement" in the Policy. (See ECF No. 90 at 24–26). Cf. High Point Design, LLC v. LM Ins. Corp., 911 F.3d 89, 95 (2d Cir. 2018) (recognizing that "'offer[ing] for sale' includes activities that are not advertising"); Jovani Fashion, Ltd. v. Fed'l Ins. Co., 416 F. Supp. 3d 334, 339 (S.D.N.Y. 2019) (finding that selling or displaying a product was not an "advertisement" under policy definition); Hosel & Anderson, Inc. v. ZV II, Inc., No. 00 Civ. 6957 (LAK), 2001 WL 392229, at *2 (S.D.N.Y. Mar. 21, 2001) (finding that "[t]he product itself is not an advertisement within the meaning of the policy[]"). Starr's failure to establish as a matter of law that the Emails and Order Forms were "advertisements" within the meaning of the Policy is thus an additional ground that precludes summary judgment in Starr's favor. See Lefrak Org., Inc. v. Chubb Custom Ins. Co., 942 F. Supp. 949, 952 (S.D.N.Y. 1996) ("If the insurance company fails to satisfy its burden of establishing a policy exclusion, the ambiguous language must be construed against the insurer, as the drafter of the contract."); Dean v. Tower Ins. Co. of N.Y., 19 N.Y.3d 704, 708 (2012) (explaining that ambiguities in an insurance policy "are to be construed against the insurer" and affirming denial of summary judgment for insurer where undefined term was "ambiguous" and disputed questions of fact existed).[8]

---

[8] Given the Court's analysis and Starr's concession that Abbott alleges an "advertising injury," (see § III.B.2.b.i, supra), the Court does not need to analyze PriMed's third argument that the Emails do not infringe on Abbott's "trade dress." (ECF No. 76 at 25–29).

In conclusion, the Court holds that Starr has failed to establish that the Prior Publication Exclusion conclusively applies as a matter of law, and therefore, its Motion must be DENIED.  See Park Place Enter., 2003 WL 1913709, at *6 (denying insurers' motion for summary judgment where "the court cannot conclude as a matter of law that there is no possible factual or legal basis upon which the insurers might eventually be held to be obligated to indemnify" insured). Correspondingly, because Starr has not established that the Prior Publication Exclusion applies, Starr has a duty to defend PriMed in the Abbott Litigation, and PriMed's Motion must be GRANTED.  See CGS Indus., Inc., 720 F.3d at 82–83 (holding that, where insurer failed to establish exclusion applied, insurer had duty to defend insured); Lexington Ins. Co., 961 F. Supp. 2d at 557–58 (granting insured's motion for summary judgment as to duty to defend and denying insurer's motion for summary judgment where "mere existence of a factual dispute regarding the first date of publication establishes that [the insurers] had the duty to defend" insured in underlying litigation); Bridge Metal, 812 F. Supp. 2d at 543–47 (granting insured's motion for summary judgment as to duty to defend where insurer failed to demonstrate that any exclusion applied); SAS Grp., Inc., 2010 WL 11590320, at *9–10 (granting insured's motion for summary judgment as to duty to defend where insurer failed to establish that any exclusion applied); Lefrak Org., 942 F. Supp. at 957 (same); see also Hugo Boss Fashions, Inc. v. Fed'l Ins. Co., 252 F.3d 608, 625 (2d Cir. 2001) (affirming grant of partial summary judgment to insured on insurer's duty to defend).

## IV.  CONCLUSION

For the reasons set forth above, PriMed's Motion is GRANTED and Starr's Motion is DENIED.   The parties are directed to meet and confer and submit a joint letter by

**Thursday, March 23, 2023** advising as to whether (1) they would like referral to another Magistrate Judge or the Court-annexed mediation program, (2) they will engage in private mediation, to resolve the remaining disputes in this action, or (3) they would like the Court to schedule a conference to discuss a schedule for the remainder of pre-trial proceedings.  The Clerk of the Court is respectfully directed to close ECF Nos. 75, 85, 90, and 91.

Dated:        New York, New York
              March 16, 2023

SO ORDERED.

_____
SARAH L. CAVE
United States Magistrate Judge